The Troy Iron and Nail Factory, Appellant, *v.* Erastus Corning, John F. Winslow, and James Horner.

In 1834, Burden obtained a patent for a new and useful improvement in the machinery for manufacturing wrought nails and spikes, which he assigned to the Troy Iron and Nail Factory, and also covenanted that he would convey to that company any improvement which he might thereafter make.

In 1840, he made such an improvement, for making hook and brad-headed spikes, with a bending lever, which he assigned to the Troy Iron and Nail Factory.in 1848.

Before this last assignment, however, viz., in 1845, Burden made an agreement with Corning, Horner, and Winslow, in which, amongst other things, it was agreed, that both parties might thereafter manufacture and vend spikes of such kind and character as they saw fit, notwithstanding their conflicting claims.

wing to the peculiar attitude of the parties to each other at the time of making this agreement, and the language used in it, it cannot be construed into a permission to Corning, Horner, and Winslow, to use the improved machinery patented by Burden in 1840 ; and the right to use it, having passed to the Troy Iron and Nail Factory, a perpetual injunction upon Corning, Horner, and Winslow will be decreed.

This was an appeal from the Circuit Court of the United States for the Northern District of New York.

The facts are all stated in the opinion of the court.

The bill was filed in the Circuit Court, by the Troy Iron and Nail Factory against Corning, Winslow, and Horner, to restrain them from violating a patent issued to Henry Burden on the 8th of September, 1840, for new and useful improvements in the machinery for making hook, or brad-headed spike, which patent had been assigned to them; and also to account for the profits.

After the proceeding, mentioned in the opinion of the court, the Circuit Court passed the following decree:

This cause having heretofore been brought to a hearing upon the pleadings and proofs, and counsel for the respective parties having been heard, and due deliberation thereupon had, and it appearing to the said court that the said Henry Burden was the first and original inventor of the improvement on the spike-machine in the bill of complaint mentioned, and for which a patent was issued to the said Henry Burden, bearing date the 2d of September, 1840, as in said bill of complaint set forth, and that the said complainants have a full and perfect title to the said patents for said improvements, by assignment from the said Henry Burden, as is stated and set forth in the said bill of complaint.

But it also further appearing to the court, on the pleadings and proofs, that the instrument in writing, bearing date the 14th of October, 1845, stated and set forth in the said bill of complaint, and also in the answer of the said defendants thereto, entered into upon a settlement and compromise of certain conflicting claims between the said parties, and among others of mutual conflicting claims to the improvements in the spike machine in said bill mentioned, and when said instrument was executed by the said Henry Burden of the one part, and the said defendants of the other; the said Henry Burden, at the time, being the patentee and legal owner of the said improvements, and fully authorized to settle and adjust the said conflicting claims, did, in legal effect, and by just construction, impart, and authorize, and convey, a right to the defendants to use the said improvements in the manufacture of the hook-headed spike, without limitation as to the number of machines so by them to be used, or as to the place or district in which to be used.

Therefore, it is ordered, adjudged, and decreed, that the said bill of complaint be, and the same is hereby, dismissed, with costs to be taxed, and that the defendants have execution therefor.

From this decree, the complainants appealed to this court.

It was argued by *Mr. Johnson* and *Mr. Stevens*, for the appelants, and *Mr. Seward* and *Mr. Seymour*, for the appellees.

As the case turned mainly upon the construction of the agreement of October 14th, 1845, (which is inserted in the opinion of the court,) only such of the arguments of counsel will be given as relate to that construction.

The counsel for the appellants contended,

*Third.* It is respectfully submitted, that the instrument of the 14th of October, 1845, does not convey to the defendants any right or title to said invention, or give them any authority to use it in manufacturing hook-headed spikes. Such was not the object or intention of the parties.

This instrument was executed under the following circumstances :

At the June term of the Circuit Court, 1843, Mr. Burden recovered a judgment for $700, against the defendants, for violating this patent.

On the 2d of October, 1843, Mr. Burden filed his bill in equity in said Circuit Court, to restrain the defendants from further infringing the patent, and for an account.

After this bill was filed, the defendants ceased using the invention, for a short time; and then commenced using it again, as Mr. Burden was informed. Mr. Burden, therefore, on the 13th November, 1844, made a new affidavit, to obtain an injunction upon his bill previously filed; and, on the 20th of November, obtained an order for an injunction by default.

On the 25th of November, 1844, the defendant Winslow, and two men by the name of Osgood and Blanchard, made affidavits in said cause, for the purpose of moving the court to open the order granting an injunction ; in which affidavit, they all swear that defendants did not use Mr. Burden's invention, in making hook-headed spikes, but made them with machinery entirely different in principle and mode of operation.

The machinery, by which defendants claimed to make the hook-headed spike, after the bill was filed, is described in two patents, granted to the defendants, or some of them.

Prior to these legal proceedings, in November, 1844, the parties had been endeavoring to settle, but did not succeed·; subsequently, negotiations for a settlement of the suit were renewed. Mr. Burden claimed that he had the exclusive right to manufacture the hook-headed spikes by machinery, and insisted that defendants should cease making such spikes by machinery. Defendants insisted they had a right to make such spikes by their own machinery, which they insisted, in their affidavits, made November 25th, 1844, was entirely different, in principle and mode of operation, from that patented to Mr. Burden.

Mr. Burden claimed, that defendants had violated his patent for machinery for making horseshoes, and told defendants, if they did not immediately desist from using his horseshoe machine, he would prosecute them, and they did desist and stop, six months before the settlement was made.

It is necessary and proper to take these facts and circumstances into consideration, in giving a construction to the agreement of the 14th of October, 1845.

"It is well settled, that in the construction of all contracts, the situation of the parties, and the subject-matter of their transactions, may be taken into consideration, in determining the meaning of any particular sentence or provision. Extraneous evidence is admissible, so far as to ascertain the circumstances under which the writing was made, and the subject-matter to be regulated by it." Sumner v. Williams, 8 Mass. R. 214; Fowle v. Bigelow, 10 Mass. R. 384; Wilson v. Troup, in the Court for the Correction of Errors of N. Y. 2 Cow. 228 – 9; Nesmith v. Calvert, 1 Wood. & Min. 40.

I. This agreement does not, by its terms, convey, or purport to convey, or in any manner to give or invest the defendants with any interest in, or right or authority to use the machinery patented in September, 1840, to make hook-headed spike.

1st. It was contended by the defendants, (and, as we understand the decree, so decided,) that the 2d clause in the agreement, in legal effect, did impart, authorize, and convey to the defendants a right to use the said improvements, without limitation as to the number of machines used by them, or as to the place or territory where they might be used.

The 2d clause of the agreement is in these words: "And it is further agreed, that the said parties may each, hereafter, manufacture and vend spike of such kind and character as they see fit, notwithstanding their conflicting claims to this time."

After the judgment at law, in 1843, there was no conflict as to the right of defendant to use Mr. Burden's improvement in manufacturing hook-head spike. That had been fully settled against the defendants, by the suit at law, and conceded by them.

The defendants did not claim the right to use Burden's invention; but only the right to make said spike by machinery, which they claimed was different from Mr. Burden's, both in principle and operation. Mr. Burden denied this right claimed by the defendants, and claimed that he had the exclusive right to make such spike by machinery. This was the only conflicting claim, as to the right to make spike at the time of the settlement. By this clause in the agreement, Mr. Burden relinquished his pretensions to the exclusive right to make hook-

headed spike by machinery; but he gave no right to the defendants to use his improvement in manufacturing such spike.

Whether Mr. Burden was right or wrong in his pretension to the exclusive right to make such spike by machinery, can in no manner affect the construction of the agreement.

The intention of the parties, as expressed in the agreement, taken in connection with the state of facts and circumstances under which it was executed, and the subject-matter intended to be regulated by it, must control the construction of this clause. Mr. Burden supposed he had such exclusive right, and simply relinquished it, without the most remote idea that he was conveying to the defendants any right to use his improvement, much less, that he was conveying an interest in his patent equal to one half of it.

The settlement of the equity suit, — the relinquishment by Mr. Burden of his pretension to exclude the defendants from making hook-headed spike by machinery, — and the settlement, by defendants, of Mr. Burden's claim against them, for infringing his horseshoe patent, for which he had threatened them with a suit, — fully satisfies every clause in the agreement; and it cannot be stretched to the enormous extent claimed by defendants, without interpolating other important provisions, which cannot at law be accomplished by parol evidence. An assignment, or any other conveyance of any part of a patent, or of any interest in or under it, must be in writing. Contracts, which by law are required to be in writing, cannot rest partly in writing and partly in parol. Is it not most extraordinary that the defendants did not have this agreement recorded in the Patent-Office until the 21st of August, 1848, if they had had the least idea that it conveyed to them such an important right as they now claim? Patent Act of 1836, § 11; Curtis on Patents, p. 478.

This instrument has neither the form nor substance of a license or assignment, or any other conveyance of an interest in a patent heretofore in use or known.

If the parties had intended this instrument as a conveyance of any interest in Mr. Burden's improvement, it would have been very easy to have said so. Nesmith v. Calvert, 1 Wood. & Min. 40; Iggulden v. May, 7 East, 242.

The court below fell into the mistake, that the cause depended upon the question, whether the agreement authorized the defendants to make hook-headed spike.

The opinion of the court, after stating the 2d clause in the agreement, proceeds: " Why stipulate that the defendants may thereafter manufacture and vend spikes of any character and description, without regard to previous claims to the contrary

17 *

if it was not intended to admit or concede the right to manufacture hook-headed spikes? and how can we say that this particular spike is not embraced in the stipulation?

" What is meant by the agreement, that the defendants may manufacture spikes of such a kind and character as they see fit, notwithstanding their (the parties) conflicting claims to this time, if it was intended to exclude hook-headed? The argument is quite as strong and well founded, to exclude spikes of any other description. Indeed, stronger, if it were possible, as this particular spike was the principal item in controversy at the time of the compromise or settlement, and a suit was pending in respect to it.

" The language of the instrument is certainly most remarkable, if it was intended by the parties to exclude the defendants from the right to make this particular spike, as there are not only no words of exclusion or prohibition, but an express admission of the right, in terms so full and specific, that no argument can make it clearer. We are asked to interpret a stipulation, to make any kind of spike the parties see fit, to mean any kind except hook-headed; and spikes, too, in the case of a compromise of a disputed right to manufacture spikes of this character and description, among other matters, this being regarded as the principal one. We think it impossible to come to any such conclusion, without a disregard to the clear import of the agreement."

The counsel for the appellant in the court below must have been exceedingly unfortunate, if his language presented any such idea. The bill does not claim it, and the written points handed to the court do not pretend it. On the contrary, it was conceded, that Mr. Burden relinquished his pretensions to the exclusive right to make those spike by machinery, but insisted that he had given no right to defendants to use his improvements for that purpose.

2d. The decree assumes that, among the conflicting claims settled by the agreement of 14th October, 1845, were the mutual conflicting claims to the improvements in the spike-machine, patented by Mr. Burden.

This is mere assumption, founded wholly in mistake. No such conflicting claim is stated in the instrument, and none such was proved to exist at the time of the settlement. The very reverse was sworn to the year before, by the defendant, Winslow, himself, and by two other witnesses, by his procurement. The correspondence which took place before the settlement, shows that no such claim was set up or pretended by the defendants. The judgment at law had fully and definitely settled and determined that the defendants had no such right.

But if such conflicting right to Mr. Burden's improvement had existed at the time of the settlement, the terms of the agreement would not confer any right upon the defendants to use it.

The agreement concedes the defendants' right to make any kind of spike they see fit, which of course embraces hook-headed spike; but it does not, directly or indirectly, give or concede the right to defendants to use Mr. Burden's improvement for that purpose. " The said parties may each, hereafter, make and vend spike of such kind and character as they see fit." But how manufacture? The agreement does not specify how,; but the plain construction is, that it should be done as it had been done from the recovery of the judgment at law, up to the time of the settlement — that Mr. Burden should manufacture the spike with his machine, and the defendants with their machine, which they claimed and swore was totally different from Mr. Burden's in principle and mode of operation. Can it be pretended, that the defendants gave Mr. Burden any right to use their machine? Had Mr. Burden ever claimed any such right? Had it been shown, that hook-headed spike could not be made without the use of Mr. Burden's improvement, it might have furnished some ground for an argument that, by implication, such right was given by the agreement.

But such was not the fact. Hook-headed spike could be made, and were made by hand, prior to Mr. Burden's invention; and the defendants show that, as early as the fall of 1844, that they had machinery by which they made hook-headed spike, which was wholly different, both in principle and mechanical operation, from Mr. Burden's improvement; and the only right they claimed, after the judgment at law up to and at the item of the settlement, was to make such spike by that machinery, and disclaimed all right or desire to use Mr. Burden's improvement.

3. Mr. Burden could not have intended to convey such an interest to the defendants.

It would have been a violation of his duty to, and his contract with, the appellant; and would have deprived him of the benefit of a contract from which he received more than $10,000 annually.

4. There was no adequate consideration for the conveyance of such an extensive interest in this patent.

The defendants allege, in their answer, that the purchase by them of the appellant, of half of a dock, was a part of the same transaction, and a part of the consideration for this agreement.

This pretence is fully disproved. The evidence clearly shows,

that the agreement to purchase the dock, although made at the same time with the other agreement, had no connection with it, and that the one half of said dock was worth more than the $15,00 which defendants paid for it.

The defendants also set up in their answer, that their agreement not to make horseshoes, was a part of the consideration of the agreement on the part of Mr. Burden.

The evidence shows the facts to be, that prior to this settlement, the defendants had been infringing Mr. Burden's patent for a machine to make horseshoes — were threatened with a suit if they did not desist, and they did desist six months before the settlement. The defendants had a patent for machinery to make horseshoes, but it was worthless.

Mr. Burden did not claim that the defendants should not make horseshoes with the machinery they had patented, but that they should not use the machinery he had patented for that purpose. If horseshoes could have been made by the machinery patented by defendants, the agreement gives neither Mr. Burden nor the appellant any right to use that machinery, nor does it restrict the defendants from selling to others the right to make horseshoes, with the machinery patented by them. There is nothing in the agreement which would prohibit the defendants, or their assignees, from maintaining a suit against the appellant, or any other person, for infringing defendants' patent, should the appellant or any other person use the invention thereby patented.

The defendants also allege, in their answer, that they had used the improvement in question, to make hook-headed spike since said settlement, and appellant never requested them to cease using the same, or to account for any profits for such use.

The fact thus alleged, the defendants insisted in the court below, was a circumstance to show that the appellant and Mr. Burden understood and considered the said agreement, as conveying to the defendants the right to use said improvement.

The answer to this is :

1. The answer does not allege, that the appellant, or any of its officers or agents, knew that said defendants were using said improvement.

2. It is proved, that neither Mr. Burden, nor any other of the officers or agents of the appellant, knew that defendants were using said improvement, until August, 1847.

Defendants also insist, that Mr. Burden, by his letters, bearing date between the 9th of March, 1846, and 29th December, 1846, both inclusive, requesting defendant Winslow, to agree upon the price for which they would sell hook-headed and other spike, recognizes the defendants' right to use said improvement.

The answer to this position is, that just such an arrangement, as requested in those letters, had existed between the appellant and defendant, for nine years before the settlement of 14th October, 1845, and at the time Mr. Burden wrote those letters, he did not know that defendants were using his improvement to manufacture hook-headed spike.

The letters were also written by Mr. Burden, before he knew defendants were using his improvement in making hook-headed spike.

Indeed, none of the letters, in any manner intimate, that the defendants were using, or had any right to use the improvement.

The counsel for the defendants in error contended, that the decree of the Circuit Court should be affirmed, because,

I. The agreement of October 14th, 1845, was a valid agreement, binding upon the parties.

1. It was made by parties fully competent to contract in reference to the subject-matter of the contract.

Burden was patentee, and as such, could contract for himself as the owner of the patent. He was also at the time a large stockholder in the complainants' corporation, and their agent, and as such, could contract for them.

The allegation, made by the complainants in their bill of complaint, that Henry Burden "had no power or authority to give such license, your orator having been the legal and equitable owner of the said last-mentioned patent, and the rights and privileges granted and secured thereby, from the time said patent was granted," is not sustained by the proof.

The only proof tending to show that on the 14th October, 1845, the complainants were the owners of this improvement of the bending lever, and that therefore Burden had no authority to grant a license, or make a contract as to the use of the same, is to be found in the agreement between Burden and complainants as to the patents for the spike machine and the horseshoe, and dated 2d December, 1836.

In reference to this agreement, the defendants insist as follows:

1. The agreement between the plaintiffs and Henry Burden, of December 2d, 1836, did not even purport to convey to the plaintiffs any interest or right to the patent of 1840, or to the bending lever, the thing patented. It first gives the right to use the machines for manufacturing wrought nails or spikes, then on the premises of the company; and secondly, the exclusive right to construct other machines for the manufacturing wrought nails or spikes, after the method invented by Burden, with all the improvements which he had made, or should make, in the same, in any other part of the United States; and thirdly, a

covenant that he, Burden, would obtain a patent for any improvements which he should afterward make in his nail and spike machine; and then provides that "the license hereby granted to the party of the second part, shall be deemed to extend to all such improvements." It only contemplates the granting of a license; and the statement in the assignment of June 19, 1848, that Burden had agreed to transfer and assign the improvement, is not true.

The bending lever, patented by the patent of 1840, was not then in existence. It was a mere contingent possibility, and therefore was not susceptible of being conveyed. There was nothing to convey. Phillips on Patents, 354; Curtis on Patents, sec. 189.

The privilege of assigning, given by the eleventh section of the Patent Act of July 4, 1836, implies that the thing assigned shall be then in existence, and the subsequent requirement in the same section, as to recording the assignment, supports the same idea.

2. Even if this agreement did purport to grant and assign a future improvement thereof, such grant could not apply to the bending lever, for the reason that the bending lever is not an improvement upon either of the patented machines mentioned in the agreement of December 2d, 1836, but is a distinct and independent article, or invention, equally applicable to any spike machine, and in fact, used upon various other machines.

The plaintiffs consider the agreement of December 2d, 1836, as merely a covenant to convey the improvement alleged to have been patented on the 2d of September, 1840; and have accordingly resorted to a special assignment of it, which was made on the 19th of June, 1848, and which, in terms, refers to the agreement of December, 1836, as merely a covenant to convey subsequent improvements, and purports to have been given in performance of such covenant.

The right of the plaintiffs to this improvement of the bending lever is based in their bill upon the assignment of the 19th June, 1848. This right is therefore subject to any rights that were acquired by the defendants by the agreement of October 14, 1845.

But if the complainants had, previous to the 14th October, 1845, become the owners of the improvement called the bending lever, and the patent therefor, still, as general agent of the corporation, Burden had a right to enter into the agreement of October 14, 1845, and it binds his principals.

3. The agreement of October 14, 1845, was founded upon a good and valuable consideration, as between the parties—1st, the settlement of the suit then pending between them; and

2d, the relinquishment by the defendant, Winslow, in behalf of himself and his copartners, of the right to manufacture the patent horseshoe, an advantage worth to the other contracting party, $10,000 per annum.

3. The agreement, too, was carried out by the parties; first, by the conveyance of the dock property by the plaintiffs, and its occupation by the defendants; second, by the payment of the consideration of the dock property by the defendants; thirdly, by the relinquishment by the defendants, of the horseshoe business, from that time to the present, and the enjoyment of it as a monopoly ever since by the plaintiffs; fourth, by the continued use by the defendants, of the bending lever in making hook-headed spikes, from the 14th of October, 1845, to the 8th July, 1848, two years and about nine months, without objection, they having made, during that period, hook-headed spikes to the value of over $137,000.

III. The agreement of October 14, 1845, was a contract for the settlement of conflicting claims to two patented machines, one for the bending lever, and the other for the horseshoe machine, and it not only gives rights to make the spikes and the horseshoes, but to use the respective patented machines in making them.

The agreement of October 14, 1845, does not, in terms, give the right to the defendants to use the machines patented by Burden, by his patent of 1840, but it does give it by the strongest implication. It releases all claims for violation of patent-rights, up to that date, and gives the right to both parties, thereafter, to manufacture and vend spike of such kind and character as they see fit, notwithstanding their conflicting claims to that time.

Defendants' exhibits show that those conflicting claims related only to the use of the patented machinery. This is also shown by Burden's letters. The subject-matter of this general settlement was, therefore, their conflicting claims to the use of the patented machinery. The agreement gives the right to make the spike, which could be made for sale in market only by the use of the bending lever, or of some analogous device. 1 Washington's C. C. Rep. 168, Rutger v. Kanowrs & Grant; Phillips on Patents, 346.

A construction of the agreement of October 14, 1845, which would allow the defendants only the privilege of making the hook-headed spikes, and would deny them the use of the bending lever in making them, would render the instrument senseless, absurd, and inoperative.

For, if it is held, that the defendants obtained under the agreement only the privilege of making hook-headed spikes, either by

hand, or by the use of any machinery which they might choose, other than that which should infringe upon Burden's patent, then it results that the defendants relinquish the patent horseshoe business, worth, as is proved by the testimony of Mr. Davidson, $10,000 per annum, for the privilege of doing just what they had a right to do before, and what every body else had the right of doing, that is, making those spikes by hand, or with any machinery not infringing on Burden's patent. Such a construction would be contrary to the well-settled rule in the interpretation of contracts, that, when a clause is capable of two significations, it should be understood in that in which it will have some operation, rather than in that which it will have none, " *ut res magis valeat quam pereat.*" Pothier, cited in 2 Comyn on Contracts, 533; Parkhurst *v.* Smith, Willes's Reports, 332; Archibald *v.* Thomas, 3 Cowen, 290. An agreement or contract must have a reasonable construction, according to the intent of the parties, as if a man agree with B. for twenty barrels of ale, he shall not have the barrels after the ale is spent. Comyns's Digest, Title Agreement, C. So if a man promise payment, without saying to whom, it shall be intended to him from whom the consideration comes. Cro. Eliz. 149. And upon a promise of payment, according to the rate of forty shillings per ton, it shall be intended that payment will be made for the odd pounds, according to the same rate. Yelverton, 124.

The practical construction of both parties has been in conformity to the interpretation on which the defendants insist. " *Contemporanea expositio est fortissima lex.*" If the construction were a doubtful one, it should, under the circumstances, be held to be against that set up by the plaintiffs, whose grantor, Henry Burden, is the contractor. In a case of doubt, the words of a promise, or covenant, are to be taken most strongly against the promisor or contractor. Coke Lit. 183, a. This rule should be applied, in this case especially, for two very apparent reasons: First, because it was well understood, by both parties, with what machinery alone these hookheaded spikes could be successfully made for sale in market, and that the defendants were then using that machinery in their works; and, secondly, because Burden had a strong pecuniary motive to deal in generalities, and not to grant, specifically and clearly, a license to use the bending lever. He feared he might jeopard the thirty per cent., secured to him by the agreement of December 2d, 1836, and which was afterwards in controversy, and was claimed by the plaintiffs to have been forfeited by him; and yet he desired to obtain the monopoly of the horseshoe business.

The contemporaneous exposition of the agreement, by Burden,

is in accordance with the position of the defendants. See his letter of December 15th, 1845, and his letter of December 11th, 1846. In this latter letter, Burden speaks of his intention to share the spike business with defendants. He very well knew that could not be done, except by uniform prices, and that we could have no uniform price with him, unless we used the bending lever.

But there was an actual sharing between appellant and respondents, of contracts for spikes. Burden declared that it was his intention to share with respondents the spike business, and this was done, as is shown by his letters. Such was the practical contemporaneous construction of the agreement, and it appears, by Burden's letter of February 10th, 1848, that not only was there to be an uniform price for hook-headed spikes, but that the whole field was to be occupied by the parties in common, and to the exclusion of all others. The whole object of this letter was to tell respondents what he had been doing to protect their common rights. Can there be any thing more needed to show that it was the understanding of both parties, that by the agreement of October 14th, 1845, respondents had the right to use the bending lever?

Winslow's letters, written in January, 1845, show that respondents were using the bending lever at that time, and that Burden then knew it. In Burden's letter of January 10th, 1845, and in Winslow's reply to it, of January 13th, 1845, they both refer to "the machinery in question," which can only mean the bending lever.

IV. But whatever might have been the construction which a court would, under other circumstances, have put upon this agreement—a Court of Equity will not now grant an injunction, as is prayed for in the complainants' bill, after an acquiescence in the use of the patented machinery, under this agreement of October 14th, 1845, for near three years before the commencement of this suit. Wyeth v. Stone, 1 Story, 273; Rundle v. Murray, Jacob's R. 311; Williams v. the Earl of Jersey, 1 Craig & Phil. 91; Warwick v. Hooper, 3 Eng. Law and Eq. Rep. 233, cited; U. S. Dig. Appendix, vol. 5, 1851, title *Patent*.

Mr. Justice WAYNE delivered the opinion of the court.

This is an appeal from the Circuit Court of the United States for the Northern District of New York.

The appellants are a manufacturing company, incorporated by the laws of the State of New York. They aver, that Henry Burden was the inventor of a new and useful improvement in the machinery for manufacturing wrought nails and spikes, for which letters-patent were granted to him, on the 2d of Decem-

ber, 1834. They allege that it was assigned to them, for a valuable consideration, and also, that Burden covenanted with them, if he should thereafter make any improvement upon his invention, that he would convey the same to them. Burden afterwards did make a new and useful improvement in machinery for making hook or brad-headed spikes, for which a patent was granted to him, on the 2d of September, 1840. He assigned it to the complainants, in virtue of his covenant, whereby they became the exclusive owners of the patent. They then complain that the defendants had infringed the same, by having erected and put in use, in their iron and nail works, in the city of Troy, four or five machines for the manufacture of hook, or brad-headed spikes, containing the improvements in their assigned patent, and had used them for manufacturing hook, or brad-headed spikes, since the 15th of October, 1845.

It is also stated, that Burden brought an action at law against the defendants, for an infringement, secured by the patent of September 2d, 1840. The defendants resisted a recovery, upon the ground that Burden was not the first inventor of the improvements for which that patent had been obtained. A trial of this case, upon the merits, resulted in a verdict for Burden, for seven hundred dollars, which was carried into a final judgment against the defendants, after a motion which they made for a new trial had been overruled.

The defendants are then charged with again using the improvements in the patent of 1840, under the pretence that they have a license from Burden to do so. This is denied by the complainants; and they say, if such license had been given by Burden, that it was in contravention of his assignment to them of his patent, by which they became the legal and equitable owners, from the time it was granted, on September 2d, 1840.

The bill is then concluded, with a prayer that the court would enjoin the defendants, Corning, Horner, and Winslow; their attorneys, and agents, and workmen, to desist from making, using, or vending, any machine containing the improvements, for which letters-patent were granted to Burden, on the 2d of September, 1840; and, from selling or using any spikes which they then had on hand, which had been manufactured by their machines containing the improvements of that patent. An account of the profits, which they had derived from the use of such patented improvements, is also called for.

The letters-patent granted to Burden, on the 2d day of September, 1834, and that of the 2d of September, 1840, describing an improvement called a bending lever, in the machinery for making hook or brad-headed spikes, are made exhibits to the bill.

This bill was answered by the defendants.

It admits that the complainants were an incorporated body, under the style of the Troy Iron and Nail Factory Company; also, that Henry Burden was the inventor of the improvements in the machinery for making nails and spikes, for which letters-patent were granted to him in December, 1834, and that he as-signed the same to the complainants two years thereafter. But they deny that there was any covenant in the assignment, or in any other agreement then recorded in the Patent-Office, or any agreement between Burden and the complainants, obliging him to convey to them any improvement which he might make upon his invention. And they insist, if such an agreement was made, that, as it was only a covenant to convey a contingent possi-bility, which would be inoperative and void, and could not affect them. The defendants also admit that Burden obtained the pa-tent of 2d September, 1840; but they deny its validity. They declare that the bending lever, described in the specification of it, or one similar to it in form and principle of construction and operation, had been invented and had been used by several per-sons in making spikes for several years before the patent had been obtained by Burden for his improvement of the bending lever. They state that it was invented by Thomas and William Osgood, and used by them in the years 1835, '36, '37, '38, upon one of their spike machines, to make hook or brad-headed spikes, which they sold during those years in Philadelphia. It is also stated by the defendants, that the bending lever, patented by Burden, was the invention of one Ebenezer Hunt, whilst he was in the employment of the former. It is then admitted that Burden assigned to the complainants his patent for the bending lever, in June, 1848; but it is said to have been fraudulently done, and that the appellants have no right, legal or equitable, to that improvement, under that assignment, or by that of the agreement between the complainants of Burden, of December, 1836. And, it is added, should they have any right or interest in the patent for Burden's bending lever, that the defendants have also the right to use the same under an agreement with Burden of the 14th October, 1845, which was made for him-self, and in behalf of the appellants, as their agent, before he had assigned it to them in 1848.

The defendants then aver, that this agreement of the 14th October was made with the understanding of both parties; that it would finally settle all differences between themselves and Burden and the complainants, which had arisen out of counter claims by both parties to a patent for making horse-shoes, and also to a patent-right for making hook or brad-headed spikes, each party claiming the right to manufacture and vend

such horseshoes and such spikes, under their respective counter claims and patents, without the permission of either to the other, and to use, in the manufacture of the brad-headed spike, Burden's bending lever.

The consideration of the agreement is said to have been a purchase by the defendants from the complainants, of an undivided half part of a dock on the Hudson River, for $1,500,— a grant by the defendants to them for the exclusive manufacture of patent horseshoes,—and a mutual relinquishment of their counter claim to the patents for making hook-headed spikes by a bending lever. It is averred, that they had used Burden's bending lever in the manufacture of such spikes, from the date of the agreement, with his knowledge, without objection by him or by the appellants, and that Burden had discontinued the suit against them. It is not necessary to state more of the pleadings. The abstract given discloses what had been the relations between these parties for several years before this suit was brought, and their views and conduct respecting the patent for the bending lever.

We will now turn to the evidence in the case. It shows, first, that every allegation in the bill has either been proved or admitted by the answer of the defendants, excepting such as they respectively make concerning the agreement of the 14th October, 1845, which will hereafter have our attention.

The letters-patent obtained by Burden, in 1834, which describes a machine for making nails and spikes, is annexed as an exhibit to the bill, and so is that afterwards granted to them, in 1840, for his improvement on the first, for making hook or brad-headed spikes. The answer admits that he was the inventor of the first, and that he had a patent for it. It also admitted that he obtained a patent for the other; but it is denied that he was the inventor of it. This the defendants have failed to prove; and, in our opinion, the evidence given by them on that point rather serves to establish the originality of the invention than to impair it. We think so, because it is uncertain and conflicting, and, as our learned brother said concerning it in the court below, is irreconcilable. The appellants stand upon that patent as the first which was granted for the bending lever, and they may well do so, until other evidence than that in this record shall be given to disprove its originality. It is admitted that Burden assigned that patent also to the appellants; but it is said to have been fraudulently done, and that it was not made, because Burden had covenanted, in his assignment to them of his first patent, to convey to the appellants any improvements he might thereafter make upon that machine during the time that the patent had to run. The assignment by Bur-

den to the appellants of his patent for making wrought nails or spikes is dated in December, 1836, just two years after it was obtained. It contains, after the transferring clause, and in connection with it, these words, "with all the improvements which he hath made or shall make in the same, in any other part of the United States, as the said' parties of the second part shall deem expedient, during the term for which the same are or may be patented by the said party of the first part." The assignment itself being admitted by the defendants, this, as a part of it, must also be included in the admission. It is, in our opinion, a covenant which bound Burden to convey to the appellants his improvement upon his machine of the bending lever. Though the assignment of it was not made until several years after it was patented, the appellants were equitably entitled to it before. Without something besides to sustain them, than the delay in making the assignment, the defendants had no ground for stating that it was a fraudulent device to overreach and defeat the agreement between themselves and Burden, of the 14th October, 1845. The defendants also admit that they were sued by Burden in 1842, for an infringement of the rights secured to him by his patent for the bending lever. That, though they had resisted it, upon the ground that Burden was not the inventor, the jury, who tried the case upon its merits, had returned a verdict against them for the infringement, with $700 damages; and that it was carried into judgment. This was in the year 1843.

In November, 1844, Burden, believing that the defendants were again using his bending lever, for making brad-head spikes, brought against them a bill, to enjoin them from doing so, and asking for an account. They had notice of it; but, from some accidental cause, they did not appear to resist the application, and an injunction was granted until the further order of the court.

In a few days, with the view to be released from it, Mr. Winslow, in behalf of himself and his associates, filed an affidavit, with another made by Thomas Osgood and Israel Blanchard. In each of them, they swear that the defendants were not using Burden's invention in their manufacture of hook or brad-headed spikes, but that they made them with machinery altogether different in principle and mode of operation from that which they were using when Mr. Burden sued them in 1842 for an infringement of his patent, and when he obtained a judgment against them. Mr. Winslow states, that the machinery they were then using, is entirely different in principle and operation from the machine used by Burden in making hook and brad-headed spikes. Osgood and Blanchard, after stating that they had been in the employment of the defendants

18*

for several years, say that they were well· acquainted with the process used by the defendants in making hook-headed spikes, and with that which they were using, when the defendants were prosecuted for an infringement of Mr. Burden's patent, and that they were well acquainted with the improvement claimed to have been invented by Burden; that the machinery then used by the defendants not only differed from that which they used when they were prosecuted for an infringement of Burden's patent, but also that the process then in use by the defendants, by which the hook-head is formed, is entirely new and different, in principle and use, from the bending lever described by Burden in his patent. They proceed to say, that Burden's patent, in their opinion, is in no manner violated by the manufacture of hook-headed spikes in the mode in which they are now made by the defendants. The process mentioned, by them, and by Mr. Winslow, is not stated in their affidavits. What it was, we do not know with certainty.

These affidavits show the attitude in which the defendants put themselves, on the 25th of November, 1844, in the suit then pending with Burden.

It was this, that as a defence against that suit, they claimed the right to manufacture hook or brad-headed spikes, by machinery entirely differing, in principle and operation, from Burden's bending lever for the same manufacture.

So it continued, until the agreement of the 14th of October, 1845, was made. Then, and the day after, all of the new processes mentioned in the affidavits of Winslow, Osgood, and Blanchard, for making brad-headed spikes, and such as are described in the patents obtained by the defendants, were set aside in their factory, for Burden's more manageable and efficient bending lever.

This brings us to the consideration of the agreement. We give it, *totidem verbis.*

Agreement, made this fourteenth day of October, 1845, between Henry Burden of the one part, and Erastus Corning, James Horner, and John F. Winslow, of the other part. Whereas, a suit is now pending in the Circuit Court of the United States, in the Northern District of New York, in favor of the said Henry Burden, against the said Corning, Horner, and Winslow, arising out of the alleged violation and infringement of a patent-right, claimed by said Burden for making of spike, both parties claiming the right to make said spike : It is now agreed, between the said parties, that the said suit shall be, and is hereby, discontinued, each party paying their own costs. And it is further agreed, that the said parties may each hereafter manufacture and vend spikes, of such kind and cha-

racter as they see fit, notwithstanding their conflicting claims to this time. And the said John F. Winslow, claiming as patentee, to have the right for the benefit of the said Corning, Horner, and himself, to manufacture the patent horseshoe. And the said Henry Burden also claiming such right exclusiv ly. It is severally agreed, by said Corning, Horner, and Win low, that said Burden may manufacture said patent horseshoes, and that said Corning, Horner, and Winslow, will not manufacture them. And each party, in consideration of the premises, hereby releases to the other, or others, all claim, demand, and cause of action, by reason of any violation of the patent-rights claimed by them, as aforesaid, to the date hereof.

Dated October 14th, 1845.     H. BURDEN.

It contains, besides its premises, which will be seen are not unimportant for the construction of it, four substantive clauses.

First, the discontinuance of the suit then pending between the parties, each party to pay their own costs. Next, that each party might, thereafter, manufacture spike of such kind and character as they see fit, notwithstanding their conflicting claims to that time. Then the concession by the defendants to Burden, that he may manufacture the patent horseshoes, and that they will not do so, though they had claimed the right to make them, notwithstanding Burden's exclusive claim for that purpose. And this is followed by releases by each party to the other, of all claim, demand, and causes of action, by reason of any violation of the patent-rights claimed by them, as aforesaid, to the date hereof.

The defendants contend that, in virtue of this agreement, they have a right to use the Burden bending lever, upon their spike machines. That it was made for the settlement and compromises of all differences and claims then existing between themselves and Burden, on account of their counter claims for making patent horseshoes and brad-headed spike. And that the consideration of the agreement on their part, was, that they had given to these appellants fifteen hundred dollars, for an undivided half part of a dock on the Hudson River; had conceded to them an exclusive privilege to make patent horseshoes; and that each party had relinquished to the other their patents for making hook-headed spikes by a bending lever, so that both might use that of the other. It is further stated, by the defendants, that they had fully performed their obligations of the agreement, and that they had, from the date of it, used Burden's bending lever, in making spike, with the knowledge of Burden and the appellants, without any objection by either of them.

From the premises of the agreement, it appears that the suit

to be discontinued was one which Burden had brought against Corning, Horner, and Winslow, for an alleged infringement of his patent for making spike, each party in the suit claiming the right to do so. What their counter claims were, are not given in the agreement. They are, however, distinctly recited in the bill, and in the answer of the defendants, as they say they existed at the date of the agreement. Each party, at that time, claimed a right to make brad-headed spikes by different machines. Burden's claim is put upon his patent for the bending lever. The defendants denied that they had infringed it by the machine which they had in use, and swear that it was different, in principle and operation, from Burden's patent bending lever. It is also said by them, in their answer, that there were differences between them as to a patent for making the horseshoe. The differences, however, on that account, were never litigated by the parties, and the subject is only before us because it is mentioned in the agreement, and in the answer of the defendants in this suit.

Having ascertained, from the agreement itself, and from the pleadings in this suit, what were the conflicting claims between the parties when the agreement was made, we are prepared to give our construction to that clause of it, from which the defendants claim the right, or a license, to use Burden's bending lever for making brad-headed spikes.

It is in these words: "And it is further agreed, that the said parties may each hereafter manufacture and vend spike of such kind and character as they see fit, notwithstanding their conflicting claims to this time"—that is, up to the date of the agreement.

The limitation as to time, clearly indicates, as the existing litigation between them in the suit had been the rights claimed by both in it, to manufacture brad-headed spike, with a bending lever, operating differently in the machines which they were respectively using in their factories, that each thereafter could make and vend them, notwithstanding the claim made by Burden, in his bill, that he had, by his patent, the exclusive right to make them. The words are, "that the said parties may each hereafter manufacture and vend spike, of such kind and character as they see fit." Burden had obtained at law one verdict against the defendants, for a violation of his patent, and the suit then pending was another, which he had brought in equity, to restrain the parties from continuing the infringement. They deny that the judgment against them, in the suit at law, had settled the validity of Burden's patent. That that question was still open in the second suit, as they say it is in this, the third suit; but in no one of them did they ever claim the right

to use Burden's invention as such, or as they now claim to do, under the agreement, but they claimed, in all of them, only a right to make brad-headed spikes, by machinery which was different, in principle and operation, from Burden's patent. When the parties were adjusting a compromise of the second suit, and up to the time when it was done, Burden had claimed an exclusive right, from his patent, to make brad-headed spike with a bending lever. The defendants claimed also that right, and it was because they exercised it, that Burden sued them for an infringement of his patent. Both parties were making brad-headed spike; Burden, under an unquestioned right, growing out of his patent; the defendants under a controvertible claim, which the suit was brought to settle judicially. They had already almost obtained a monopoly for the supply of such spike for the railroads of the country. It was with the hope of doing so entirely, and with the expectation of dividing the spike business of the United States between them, notwithstanding the threatening competition of other persons, who claimed the right to make brad-headed spike, and were making them with a bending lever, that Mr. Burden and these defendants were induced to compromise their litigation. It was a mere matter of interest, which actuated them, without any other sympathies between them than the disinclination of all persons to have the relations of social life and of business broken up by protracted litigation. But each party, business-like, alive to his own interest, did not mean to make any sacrifice to the other, except such as their common object might require; that was, to drive all others out of the brad-headed spike trade. Burden had obtained one verdict against the defendants, for infringing his patent. He was suing them for doing so again, and had obtained no injunction *nisi*, to restrain them from continuing it. They continued to make spike with a machine, alleging it to be no infringement of their competitor's patent. That was the point of controversy. It was believed, by both of them, that their common interest required a relinquishment of it by Mr. Burden, and he made it, intending that each might thereafter make brad-headed spike himself, as he had a right to do, from his patent, and the defendants, as they represented themselves to be doing, by the machine which they swear was different, in principle and operation, from his, and no infringement of it. Brad-headed spike could be made with either of them, and that being the case, it was agreed that each might thereafter manufacture and vend spike of such kind and character as they might " see fit" to do.

It was admitted, in the argument of this case, and had it not been, it is certain that the agreement of October 14, 1845,

does not, in terms, give to the defendants the right to use the machines patented by Burden in 1840. But, it is said, it does give that right by implication; that such was the understanding and intention. And that is inferred from matters in the agreement and from a circumstance out of it, which are said to determine its construction in favor of the claim made by the defendants to use Burden's patent. We proceed to examine it.

In the agreement it is said, " Each party, in consideration of the premises, releases to the other all claim, demand, and cause of action, by reason of any violation of the patent-rights claimed by them, as aforesaid, to the date hereof." Those are its words.

By the premises, of course, in its use here, is meant all of the deed which precedes the releases, making every part or clause the consideration for which the releases are given. The release is a relinquishment by both parties of all claim, demand, and cause of action, for the violation of patent-rights claimed by them, to that date. It is imperfectly expressed, as to the subject-matters in controversy, which were then to be compromised as they appear in the suit. That such was the intention, appears from the language of the release, it being for any violation of the patent-rights claimed by them. The defendants never charged Burden with any violation of any patent of theirs in their pleadings. They make but two claims: The first, that they had as good a right to make brad-headed spikes as Burden had, notwithstanding his suit against them for infringing his patent; and, as patentee, that they had the right to manufacture the patent horseshoe, against the exclusive claim of Burden, under his patent, to make them. Now, though the release, as it is expressed, may imply that there had been between the parties other claims than such as we find in the suit and in the agreement, we think the words in the release, " claimed by them, as aforesaid," fix its meaning to what is expressed. And if this was not so, we should say, without these words, " claimed by them, as aforesaid," that the general words would be restrained by the particular occasion of using them; and that its meaning is, that Burden releases to the defendants, for the considerations of the agreement, all claim and causes of action up to that date, for any violation of his patent-rights for the horseshoe and bending lever, for which they asserted a claim as well as himself. T. Raymond, 399; 3 Mod. 277; 1 Lev. 235; 3 Id. 273; 2 Shower, 47.

Besides, the releases being operative only up to that date, it is very difficult to admit that it was meant to provide prospectively for the defendants to use a particular machine, for any

previous violation for which they were then to be released: It is a bar to any right of action for the past for the causes stated, and not a limitation upon the releases for any thing of a like kind which may be done thereafter.

But it was also urged, that the rights of the defendants, under the agreement, to use Burden's bending lever, might be inferred from their relinquishment to the appellant of their right to make the horseshoe. The proofs in the case disclose, that Burden had obtained, in November, 1835, a patent for a new and useful improvement in the machine for making horseshoes, and that he also patented another improvement upon that in 1843. In May, 1844, Mr. Horner and Mr. Winslow bought from Elisha Tolles and Nathaniel B. Gaylord, for $1,000, a patent for making or bending horseshoes, claimed by Tolles as his invention, of which Gaylord became the owner of an undivided half, by assignment from Tolles, before the latter obtained his patent, in 1834. In the agreement for the purchase it is recited that, the patent having been lost, a new patent was issued to Tolles, in May, 1844. The view taken by Winslow and Horner of their purchase of that patent is shown by covenants in the agreement. It is that, in case it shall at any time appear, by the decision of any court having competent jurisdiction, that the patents conveyed to Winslow and Horner were not valid and effectual to secure to them the exclusive privileges thereby granted, whether for the reason that Tolles was not the original inventor of the machine, or otherwise, then, that the purchase-money was to be returned to Horner and Winslow, with interest from the time it was received, both Tolles and Gaylord being only responsible for the portions of the money that they might receive, Gaylord guaranteeing to the purchasers one hundred dollars of the three hundred and seventy-five dollars, which it appears he did receive from Mr. Winslow, Gaylord having, on the same day, received from him six hundred and seventy-five dollars. Such was the claim of the defendants for a patent for bending horseshoes, and no more. The defendants had the right to buy such a patent, with an undertaking to pay the expenses of a law suit, if they pleased to do so. And they had a right to use the patent which they bought, if it had really been obtained, and was not an infringement of another patent. But, having shown their own apprehension of its invalidity, and provided that they were to lose nothing by it, in case it should prove to be the right, which they asserted under it in the agreement of 14th October, 1845, can only be viewed by us as a relinquishment of a very doubtful claim to make the patent horseshoe, to the exclusive claim made by Burden, to make them under his patent, which formed an inducement with the latter to enter into the release contained

in that agreement. As to the circumstance out of the agreement, upon which the defendants state formed in fact the consideration, it is only necessary to say, it sufficiently appears that the undivided half of the dock, which they bought from the appellants, was fully worth the sum paid for it when the purchase was made, and, therefore, the price given cannot be a consideration for any thing else.

We have so far construed the agreement from what is expressed in it, in connection with the claims made by the parties in the suit which Burden agreed to discontinue. There are other reasons which would bring us to the same conclusion:

Though no form has been prescribed, either for assignments of patents or for licenses to use them, we have judicial decisions concerning both which are to determine what language will make either, and how they are to be distinguished from each other. The clause of the agreement from which the defendants wish it to be inferred that they have the right to use Burden's bending lever, gives nothing definitely. The claim made by them in their answer is uncertain. It is difficult to distinguish whether they mean to claim by assignment or by a license; and when it was urged, in the argument, that they did so by license, it was equally uncertain whether they did so upon a claim which they might assign or use for others who might become owners in their factory, or which they could only personally use without being transmissible by them to others. The difference is well understood. A mere license to a party, without having his assigns or equivalent words to them, showing that it was meant to be assignable, is only the grant of a personal power to the licensees, and is not transferable by him to another. Curtis on Patents, sec. 198; 2 Story's Reports, 525, 554. It is true that, in the argument, the claim was for a license to use Burden's bending lever; but to what extent, or where, or for what time, was not said; nor can it be collected from their answer. Such uncertainties we cannot affirm of an agreement which definitely states what they may do. Further, we cannot adopt the construction of the agreement contended for by the defendants, because they gave no such consideration for such an interest in Burden's patent. We do not say an inadequate one, but no consideration. We can find none in the agreement, nor any in what is said in their answer to have been a consideration. It has already been shown, that the dock bought by them from the appellants could not have been any part of a consideration, because the proofs in the cause show that their use of it is a convenience in their business, and that the interest which they acquired in that property was fully worth the price given by them for it. In addition to what has already been said concern-

ing the relinquishment of the horseshoe manufacture, or that Burden might manufacture them, and that they would not, we cannot see how that, as a part of the agreement, can be made by any implication to mean more than this, — that it was a surrender to the exclusive claim of Burden to make them of a very equivocal right upon their part to do so, for the discontinuance of the pending suit, for the allowance to them to make brad-headed spike, which it was the purpose of the suit to prevent, and for the releases, mutually given against any future claim for past violations of the patent-rights claimed by them in their pleadings. We think, from the agreement, that such was the intention of the parties to it, notwithstanding the declaration of the defendants that it was otherwise. We do so, because there is no proof of it in the case, and because it is not permitted to a party to control a written agreement by parol testimony of declarations or conversation, at the time it was completed or before, which would contradict, add to, or alter the written agreement, either in the case of a latent or patent ambiguity, though in either, collateral facts, and the circumstances in which the parties were placed when the agreement was made, may be given in evidence. In the first case, to ascertain something extrinsic or matter out of the instrument where there is no ambiguity from the language of it, and in the other when, from defective terms, the intention of the parties may not be collected from them. In this agreement, we can see no such ambiguity of expression to make it doubtful, or any thing extrinsic connected with it to make it uncertain.

The proofs in this case disclose, that Burden's bending lever is a valuable invention. So much so, that the appellants gave to him for the assignment of it, with its improvements and for the assignment of the horseshoe patent, thirty per cent. upon the net gains of the manufacture of both, with a like interest in the value of all the machinery of both which might be on hand when the contract shall be at an end — and with the same interest in all the real estate, the additions and improvements of it, which shall be bought and made out of the earnings of the assigned machinery, with this further stipulation upon the part of the appellant, that his interest, as they have been stated, should commence six months before the date of his assignments. With such advantages, it cannot be supposed that it was understood by the parties to the agreement of 14th October, 1845, that Burden meant to put a rival establishment in possession of an interest in his patent equal to that of the appellants, for making brad-headed spike, and that for nothing.

Before concluding, we will remark, that there is no proof in the cause to maintain the averment in the answer of the de-

fendants, that they used the bending lever of Burden with his knowledge and that of the appellants, from the date of the agreement until the suit was brought, without any objection or complaint from either of them.

In every point of view which we can take of this case, we think that the defendants have infringed the patent for making hook or brad-headed spike with Burden's bending lever. We shall direct the decree of the court below to be reversed, and hall order a perpetual injunction to enjoin the defendants from using the machine with Burden's bending lever in the manufacture of brad-headed spike, and shall remand the case to the court below, with directions for an account to be taken as is prayed for by the appellants.

Mr. Chief Justice TANEY, and Mr. Justice NELSON dissented.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Northern District of New York, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of said Circuit Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Circuit Court, with instructions to enjoin the defendants perpetually from using the improved machinery with the bending lever for making hook and brad-headed spikes, patented to Henry Burden, the 2d September, 1840, and assigned to the complainant as set forth in complainant's bill, and to enter a decree in favor of the complainants, for the use and profits thereof, upon an account to be stated by a master, under the direction of the said Circuit Court, as is prayed for by the complainant, and for such further proceedings to be had therein in conformity to the opinion of this court, as to law and justice may appertain.