## NACHMAN SPRING–FILLED CORPORATION v. KAY MFG. CORPORATION.

### No. 465.

Circuit Court of Appeals, Second Circuit.

July 15, 1935.

**654** ·

Moses & Nolte, of New York City (Edmund Quincy Moses, of New York City, R. W. Lotz, of Chicago, Ill., and Clarence M. Crews, of New York City, of counsel), for plaintiff.

Harry Jacobson, of New York City (Samuel E. Darby, Jr., and John J. Sweedler, both of New York City, of counsel), for defendant.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge.

Plaintiff sued for infringement of the Suekoff patent, No. 1,411,227, which was held valid and infringed. It also sued on the Suekoff patent, No. 1,352,157, which was held valid and infringed by defendant's. tool, Exhibit 4, but not by its tools, Exhibits 5 and 6. Both plaintiff and defendant appeal.

Patent No. 1,411,227 was held valid by this court. Nachman Spring-Filled Corp. v. Spring Products Corp. (C. C. A.) 68 F.(2d) 829. Defendant's appeal does not contest validity of this patent, but contends it is licensed to use the invention. Patent No. 1,352,157 relates to a tool device adapted for inserting compressed springs into the individual pockets · of a cushion construction made under patent No. 1,411,227. The cushion is divided up in individual pockets · which are preclosed, except for a narrow opening through which a fully compressed spring may be introduced. After introduction, it is permitted to expand so as to fill the pockets and becomes trapped therein. The spring thereafter firmly retains its position and the narrow opening in the pocket is not sewed up or fastened. Thus the cushion casing and pocket structure are completely assembled and sewed together except one side, prior to the insertion of the spring. The tool is not used to compress the spring, but the compressed spring may be inserted and will be so held while they are introduced into the pockets. The springs are compressed by hand and a row of them is inserted into the tool. They are then inserted into the cushion casing and the springs discharged one into each of the pockets of a row of pockets. They are so released either by separating the bars of the tool or by pushing the springs sufficiently out of the space between the bars without separating the bars so as to cause them to complete their own discharge.

A tool made under patent No. 1,352,157 has a pair of flat elongated bars hinged together near their ends, the axes of the hinges being aligned and parallel to the length of the bars. A metal slide holds the bars together in spaced relation so that the compressed springs may be introduced between the bars and retained there while the tool and the compressed springs are inserted into the cushion casing. This is done with the springs and bars in a position at right angles to the flat top and bottom walls of the cushion casing. The tool and the springs are then rotated and the springs are released in the cells and instantly expand vertically and fill the same. In the tool one bar extends beyond the other at its forward end and is shaped to form a portion which overlaps the end of the shorter bar and serves to guide the tool on being introduced into the cushion casing. Thus the end of the tool does not catch the fabric which would make the introduction difficult.

Claims 1 and 2 describe the tool as comprising a pair of flat elongated members, which means are arranged with a space between them ·for accommodating a series of compressed coiled springs in aligned relation. They are described as being separated or spaced to accommodate the compressed springs but not as being

separable. Claim 3 describes the members composing the tool as separable, and claims 4 to 8 describe the members as hingedly connected together. Claims 4 and 5 do not specify the manner of the hinged connection nor the location of the hinges, and is sufficiently broad to include members hinged together at the end as well as at the edges. Defendant's tool, Exhibit 4, has two bars hinged together to open along the axis parallel with the length of the bars and with a sliding sleeve for locking the bars together. One end of each of the bars projects beyond and partially overlies the adjacent end of the other so that the overlying end will keep the fabric of the pocket walls from being caught between the bars when the tool with the springs is being inserted into the casing. While this guiding means for introducing the tool into the casing is not as big as the overlying end or guide of the pattern, still it performs the same function and the matter of size does not avoid infringement. Exhibit 4 is an infringement.

Defendant's tool, Exhibit 5, differs from the type of Exhibit 4 in that in this tool the elongated flat bars have a separable hinged connection at the front end of the tool, that is, at the end which is introduced first into the casing. This is formed by a pin on one of the bars which projects into a slot in the end of the other bar. The end of the slotted bar projects beyond and overlaps the end of the bar with the pin, and forms a guide head which guides the tool and springs into the casing and prevents catching on the fabric walls of the casing or pockets. At the end of the bar is a separable connection comprising a screw on one of the members engaging a notch in the other member so as to hold the bars against separation under pressure of the compressed springs inserted between them. Thus Exhibit 5 is covered by claims 1, 2, 3, 4, and 5.

Defendant's tool, Exhibit 6, contains an element for ejecting the springs into the pockets. The member for holding the springs in compressed condition is a single strap of iron which is bent around a curve at one end, the two free ends of the strap being brought together in a handle at the opposite end of the tool and welded firmly together. Two bars of metal strap are held in definite parallel spaced relationship by cross pieces located at intervals corresponding with the spacing of the springs in harmony with the respective pockets intended to receive them. But an important element of the plaintiff's inventive thought was the means for ejecting the springs into the pockets. Exhibit 6 has an additional pusher bar which comprises the channel shaped bar parallel with the spring holding members and which is connected by links with the spring holding members. The ejector member is an added part to the actual spring holding part of the tool. Exhibit 6 does not infringe.

This invention should be considered not merely as an improvement patent, but in the light of its use in the manufacture of cushions and placement of springs therein. It has proven a valuable tool, reducing the labor costs.

It is not anticipated by prior patents. The nearest invention, principally relied upon, are the two patents to Farr, Nos. 1,-334,744 and 1,334,745, the applications for which were concurrently pending in the patent office when this patent in suit was applied for. The Farr patents are alike in so far as showing a tool is concerned, illustrating a device for partly compressing a bat of curled hair and inserting it into a tubular compartment of an automobile cushion or the like. However, there is no suggestion that this tool could be used in connection with springs and it is not applicable for such use. It would be impossible to use it for the purpose of inserting compressed springs into individual pockets. The lower member of the tool is not a flat member but a deep channel. If springs were inserted into such a channel, it would be impossible to slide them out laterally in a way so as to discharge them into individual pockets. If an attempt were made to pull the parts out longitudinally, as is done in inserting a curled hair bat, the springs would probably be displaced and no useful result could be obtained. Experts testified that the tool would be wholly inoperative with springs, and could not function in the manner of the patented tool. We think the patent valid and it is infringed by appellee's type of Exhibits 4 and 5, but not by Exhibit 6.

 The Kay Manufacturing Company, prior to February 16, 1929, was a competitor of the plaintiff, and on that day plaintiff acquired its capital stock for $1,-260,000. Mr. Lipper, as owner of half the stock, invested his share of the proceeds of that sale in the plaintiff's stock and became a director. The Kay Manufacturing Company continued as the Kay Division of the plaintiff's corporation lo-

cated in Brooklyn, N. Y., and Lipper became its president. Forty per cent. of its business was burlap cushions made under the cushion patent here in suit; the remaining business related to other products. After the purchase, the burlap cushion business was reduced to 5 per cent. of the plaintiff's total manufacture in 1933 and the plant was used for other products. The equipment for making burlap cushions was shipped to plaintiff's Norfolk plant. In the depression of that year, instead of closing the Kay Division plant as considered, Mr. Lipper and associates purchased it for $222,500. The agreements carrying out this sale disclose that Mr. Lipper was permitted to use the name Kay Manufacturing Corporation and he incorporated the new company under this name. The sale was of the property, not the stock of the old corporation, and involved plant, machinery, equipment, inventory, and specified patent rights. No good will was specifically included. The Krakauer patents for making cushions, a shop right under an application for patent covering what was known as the "500 construction," an all-wire spring assembly, an assignment of pending application for patent covering a studio couch, and an express grant of the right to use the filling tools in the plant at Brooklyn for 75 days, title to the filling tools being expressly reserved in the plaintiff, were sold. The inventory sold included fabric casings of the Nachman type which had been manufactured or were in the process of manufacture and also quantities of material of burlap useful for making cushion casings of either the Nachman or Krakauer type. There was included in the sale equipment, sewing machines and fabric printing and cutting machines, useful in the manufacture of burlap casings applicable to both the Nachman and Krakauer type of casings.

Because of delay in the delivery of fabric cutting and printing equipment and sewing machines provided in the agreement, plaintiff delivered for a limited time, on terms agreed to, cushion casings made at its Norfolk plant; delivery was later made of the machinery equipment, and the transaction was finally completed October 20, 1933. Defendant says it intended always to make the Nachman type of cushion made under the patent, and to insert springs in them by means of the filling tool made under the tool patent. It claims a license so to do because of its purchase and subsequent transactions. Plaintiff denies granting any license under the cushion or tool patents, either expressed or implied. It says it did give a limited right to use the tools for 75 days. The defendant had the right to manufacture under the Krakauer patent because of its purchase.

It is claimed that an oral promise was made by Nachman to Lipper, during the sale negotiations. However, Mr. Nachman denies such a promise and the court below held against defendant's claims. The record justifies the court's conclusion. This claim is improbable. Moreover, in view of the written agreements, it is presumed that they expressed the understandings of the parties. Radio Corp. v. Cable Radio Tube Corp., 66 F.(2d) 778 (C. C. A. 2); Wigmore on Evidence (2d Ed.) § 2430. The written contracts cover the promises in such detail as to justify the claim that they represented all the agreements between the parties. Particularly, they included the assignments of patents and pending applications, shop rights, and the express license to use the tools for 75 days. That limited time use was intended for the tool patent, and that no unlimited license was intended, is apparent from the agreement. The fact that the two Krakauer patents were formally assigned indicates an intention not to grant licenses under the patents here sued on. The fact that the Krakauer patents were assigned carried an implied license sufficient in scope to enable the defendant to make cushions of the Krakauer type. United Printing Machinery Co. v. Cross Paper Feeder Co. (C. C. A.) 220 F. 322. This did not convey any right to make cushions of the Nachman type nor to use the tool in manufacturing: Troy Iron & Nail Factory v. Corning, 14 How. 193, 14 L. Ed. 383; Walker on Patents (6th Ed.) p. 424. There is no express license to use the tools or to make tools therein specified for a limited period.

Plaintiff sold defendant an Alfa machine which printed squares on the burlap casing covers, but when the casing covers were so marked, they were suitable for use in assembling or stitching either the Nachman or the Krakauer cushion type of casing. It also delivered Cameron rolls, sewing machines, material for certain pocket pieces and casing materials, to the Brooklyn plant; also it left at the Brooklyn plant casing materials manufactured or in the course of manufacture at the time of the separation of the business.

Nothing in connection with the sale of this equipment or materials warrants the assertion of a license under either of the patents. The loan of filling tools for a limited time showed no intention to grant a license under the tool patent to make tools or even to use them for a longer period of time than that authorized. The sale of the machines and the Cameron rolls. did not impliedly or expressly grant license rights. The sale of the fabric cut to proper width to correspond to the height of the partition strip pocket and having lines printed adjacent its longitudinal margins or adapted to be cut up into pieces to form the long partitions in cushions of the Nachman type, did not impliedly grant the license. This material cut as stated, could just as well have been cut up into shorter pieces to form the L-shaped partitions of the Krakauer type, and the material sold could be used for cushions made under either the Krakauer patent or the patent in suit. The claims have no merit.

Again it is argued that the fact that the plaintiff's superintendent of its Chicago factory was sent to the Brooklyn plant in the spring of 1933, before the separation, for the purpose of instructing a new factory superintendent and certain operatives there in the manufacture of plaintiff's product, including the patented type cushions, justifies an implied license to manufacture. But this too is without substance. He continued up to the time of actual separation.

It is said that because the plaintiff did not protest against the defendant's manufacturing the. Nachman type casings uninterruptedly since the date of the separation, and because defendant has always inserted springs in their casings by means of filling tools coming under the tool patent, the plaintiff has been estopped. The first protest charging infringement was a letter of March 8, 1934, and the record shows that the plaintiff acted immediately upon knowledge of infringement. Under the circumstances, no claim of estoppel may be sustained.

Plaintiff has appealed from that part of the decree which is broad enough in language as not to distinguish between materials of general utility and materials specifically suited only for the manufacture of the Nachman type cushion. When the plaintiff sold materials and fabric in the factory, it gave a license to use it in so far as it was already fitted for the Nachman type cushions. This justified the defendant in using the materials thus obtained including the burlap and it will not be obliged to account for such in this infringement suit. The decree below should be limited, however, so as to make the distinction between the permissible use of the patent for the manufacture of this merchandise unused and in the Brooklyn plant. It warranted no right of further manufacture after that material had been consumed. The sale by a patentee of an element of the patented combination capable of noninfringing use does not carry the right to make an infringing structure. General Electric Co. v. Continental Lamp Works, 280 F. 846, 851 (C. C. A. 2); Davis v. Hall Mammoth Incubator Co., 200 F. 958 (C. C. A. 1).

The decree must not require the defendant to account for the use of any material which has gone so far in manufacture or printing as to be clearly for the Suckoff cushion even though it could be changed. This includes the marked burlap. Defendant is responsible for the other infringements of both the Suckoff patents.

A decree will be entered in accordance with this opinion.

Decree modified.